**In The**
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-21-00054-CV**

**IN THE ESTATE OF JOSE C. MONTEMAYOR, DECEASED**

**On Appeal from the County Court at Law No. 2**
**Brazos County, Texas**
**Trial Cause No. 16,037-PC**

**MEMORANDUM OPINION**

Francisca Montemayor as Independent Executrix of the Estate of Jose C. Montemayor (Francisca or Appellant) appeals the judgment in favor of Zane Anderson (Anderson or Appellee) from a 2014 lawsuit filed by Anderson against Jose Montemayor (Jose) and Jose's guardians for specific performance of contracts signed by Jose and Anderson in March 2013 for the sale of five parcels of real property in Bryan, Texas.[1] After Jose and his guardians were served with the lawsuit

_____

[1] This case was transferred to our Court from the Tenth Court of Appeals in Waco, Texas under an order issued by the Supreme Court of Texas. *See* Tex. Gov't Code Ann. § 73.001.

and after his guardians filed an answer on his behalf, Jose died, and his sister, Francisca, was appointed executrix of his estate and entered an appearance as the defendant. The jury found in favor of Anderson, and the trial court entered a judgment in accordance with the jury's verdict.

Francisca appeals raising three issues. In her first two appellate issues, Appellant challenges the sufficiency of the evidence supporting two of the jury's findings. In issue three, Appellant argues that, based on her arguments in issues one and two, she should have been the prevailing party and awarded attorney's fees. Finding no error, we affirm.

Background

Anderson filed Plaintiff's Original Petition ("Anderson's Petition") against Jose and his guardians (Edmundo "Javier" Posadas, Karla Carrera, and Sergio Carrera) claiming Jose and his guardians failed to perform under five real estate contracts. Anderson sought specific performance of all five written contracts. Anderson alleged that he had agreed to buy, and Jose had agreed to sell him, the five pieces of property. Anderson and Jose executed the real estate contracts prior to a guardianship proceeding over Jose which was later filed by Jose's relatives.

According to Anderson's Petition, Anderson and Jose entered into the contracts on March 4, 2013, and the purchase price for all five properties was a total of $535,000. On April 17, 2013, Javier, Karla, and Sergio filed an application for

2

Guardianship of the Person and Estate of Jose Montemayor. On May 24, 2013, Javier, Karla, and Sergio were appointed as Temporary Guardians of the Person and Estate of Jose Montemayor, and on August 27, 2013, they were appointed as Permanent Guardians of the Person and Estate of Jose Montemayor. Anderson's Petition alleged that Anderson timely performed or tendered performance of all his obligations under the contracts and he remains ready, willing, and able to complete the contracts. Anderson alleged that Jose and the guardians have failed to fulfill their obligations under the contracts. Anderson sought specific performance of the contracts and reasonable and necessary attorney's fees.

The guardians filed a general denial answer and asserted affirmative defenses that Jose lacked capacity to contract, that Jose entered into the contracts as a result of undue influence, and that the contracts were unenforceable. After Jose died, Francisca, as executrix of Jose's estate, entered her appearance as the defendant and filed Defendant's First Amended Original Answer and Counterclaim, generally denying Anderson's allegations and asserting that Jose was excused from complying with the obligations under the contracts because he lacked sufficient mind and memory to understand the nature and consequences of his acts and the business he was transacting. The pleading also asserted a counterclaim for attorney's fees against Anderson if Francisca prevailed.

3

After a trial, the jury found (1) Jose failed to comply with the earnest money contracts; (2) Anderson was ready, willing, and able to perform the contracts; (3) Jose's failure to comply was not excused because at the time he signed the contracts he had sufficient mind and memory to understand the nature and consequences of his acts and the business he was transacting; (4) the amount of reasonable fees for the necessary services of Anderson's attorney; and (5) the amount of reasonable fees for the necessary services of the personal representative of the estate's attorney. Anderson filed a Motion for Judgment, Francisca filed a Motion for Judgment Notwithstanding the Verdict, and Anderson filed a response. The trial court signed a judgment for Anderson on the jury's verdict, ordered specific performance of the commercial real estate contracts, and awarded Anderson attorney's fees. Francisca's post-judgment motions were overruled by operation of law, and she appealed the trial court's judgment. We affirm.

Evidence at Trial[2]

<u>Testimony of Zane Anderson</u>

Zane Anderson testified that he had been a real estate broker since 2002 and had "done a lot of redevelopment of downtown historic buildings, older property redevelopment." According to Anderson, he knew Jose because they lived down the

---

[2] In this memorandum opinion, we only discuss evidence pertinent to our discussion of the issues on appeal.

street from each other when Anderson was a child, and he also knew Jose from "being a downtown business person[]" that Anderson would see maybe once a year at business association events, and Anderson knew Jose "[j]ust casually" from eating at Jose's restaurant and visiting with him there. Anderson testified that he regularly ate at Jose's restaurant with a friend, Sam Boggan. Boggan was a banker at Wells Fargo where Jose banked, and one day Jose stopped by Boggan's desk at the bank and told him he wanted Boggan to put Anderson in contact with Jose because Jose was interested in selling some property. Boggan contacted Anderson in August of 2012 and told him that Jose wanted to talk about selling a building. Anderson testified that he did not initially call Jose because Anderson was involved in other projects and did not really have the time or finances to jump into another project. In October of 2012, after Jose had inquired again with Boggan, Anderson called Jose and they set up a meeting.

Anderson testified that he and Jose met at Jose's restaurant in October, they sat at a table in the restaurant during business hours, and they discussed that Jose wanted to sell some properties. Jose was leaving for Mexico the next day, so he asked Anderson to call him in a couple of weeks so he could show Anderson the properties. According to Anderson, during the meeting Jose was glad that Anderson had finally contacted him and seemed "like himself; friendly and happy[,]" Anderson had no concerns about Jose's ability to understand their conversation or

5

about moving forward with a real estate contract with Jose, and no one at the restaurant expressed concerns about Anderson visiting with Jose about real estate or a business deal.

Later that month, Anderson called Jose and Jose showed him five downtown properties that he was interested in selling to Anderson, and Jose said that his motivation for selling the properties was that he was tired of paying property taxes on them. Jose had other properties including his restaurant that he was not selling at that time. Anderson testified that Gary McKinzie, whom Anderson had never met before, was with Jose when Jose showed Anderson the five properties. Jose told Anderson that McKinzie was Jose's "trusted friend[]" and someone who helped Jose with maintenance on his buildings. Jose brought with him a stack of cards from the tax appraisal district for each property that he was wanting to sell, and the cards showed basic details regarding each property such as the current value of the building, square footage of the building, and the square footage of the land under the building. When they left the meeting, Jose told Anderson that he and McKinzie would talk things over, and later McKinzie would get back with Anderson regarding the selling price for the buildings. Anderson testified that as Jose showed him the properties, Jose seemed to know what he owned and understood the questions Anderson asked him.

Anderson testified that in December of 2012, McKinzie contacted him and stated the selling price for all five properties was about $600,000. Anderson asked for any leases on the properties so he could consider those when making a counteroffer, and McKinzie told him that Jose had gone to Mexico again and it might be a while until McKinzie could get the leases to Anderson. Anderson testified that at that time he was familiar with the market price of downtown properties. In February of 2013, McKinzie gave him copies of the leases for two of the properties that were leased, and after considering the repairs and renovations that would be required, Anderson met with McKinzie and counter-offered with what he believed was a fair offer -- $515,000 for the five properties -- which was about twenty percent over the appraised value. McKinzie called him and countered with $535,000, and Anderson told him that they had a deal, and Anderson would have the contracts drawn up. Anderson testified that McKinzie seemed to be knowledgeable, a "good business person[,]" and "pretty astute at real estate contracts." Anderson believed that at the time the contracts were prepared in 2013 the total market value of the properties was in the range of the contracted price of $535,000 and that neither he nor Jose was getting a particular good or bad deal.

Anderson testified that he prepared the five contracts, that each contained boilerplate contract language for commercial properties and promulgated by the Texas Association of Realtors, and McKenzie picked them up from Anderson's

7

office. According to Anderson, he was going to get bank financing for four of the properties and he had asked Jose to owner finance the fifth property for two years so that Anderson could reduce closing costs by avoiding paying for appraisals on the four by using their tax appraised values and then the selling price of the fifth property was the difference in the $535,000 total selling price. Anderson testified that each of the contracts had a closing day of the later of May 31, 2013, or seven days after objections to the title commitment had been cured, but since no objections were made to the title commitment the closing date was May 31, 2013. McKinzie brought the contracts back to Anderson and they were signed by Jose and then Anderson signed them. Anderson took the contracts along with his $5000 earnest money check to a title company.

Anderson testified that to prepare for closing on the contracts he took the contracts to his bank to have his banker start the loan process, and he ordered surveys on the properties the bank was financing because Jose did not have copies of the surveys and the bank wanted them. According to Anderson, the bank ordered appraisals done on the four properties to close the loan and the interest rate for the four loans financed by the bank was "around four and a half percent." Anderson testified he did not anticipate a problem in closing the transaction until he received a phone call from Chalon Jones on April 18, 2013. Jones identified himself as Jose's former attorney, told Anderson that he was aware of Jose's real estate contracts with

8

Anderson, said that there was a 95% chance that they would not be able to close because he believed Jose lacked capacity to sign the contracts or sell the properties, and he stated that Jose did not understand the tax consequences of the sale. Anderson testified that he knew Jones was a local lawyer but did not know him personally and Jose had never mentioned him, and Anderson was shocked by Jones's call "out of nowhere." When Jones asked Anderson what title company was being used, Anderson realized Jones did not know much information and Anderson told him he was not comfortable talking to him. Thereafter, Anderson called McKinzie and McKinzie informed him that they were trying to "clear up" a problem, that Jones was Jose's former attorney that Jose had fired a year earlier, and that Jones and some of Jose's family had said he was incapacitated and had the court place him in a temporary guardianship. McKinzie said that Jose was still at the restaurant and in care of his family and that Anderson could go up to the restaurant and talk to Jose, but that the family members had a temporary restraining order against McKinzie and two of Jose's employees. Anderson testified that the next day he went to the restaurant and sat down and talked to Jose, the visit was similar to the other visits he had with Jose, no one approached and told Anderson he could not do business with Jose, it was apparent to Anderson that Jose understood who Anderson was and why he was there, Jose seemed lucid, and it was Anderson's impression that he and Jose both still wanted to go forward with the contracts. Anderson testified that at the time

9

he did not have anything to do with or understand what was transpiring with the guardianship.

Anderson testified that he had done everything required of him to close on the contracts, and that based on the commitments, the appraisals, the surveys, and arranging things with the bank, he was fully committed, fully prepared to close on the properties on May 31, 2013. According to Anderson, Anderson sent Jose's attorney a letter stating Anderson was ready, willing, and able to still perform on the contracts and was willing to close on May 31, 2013, under the agreed upon terms. Anderson testified that at the time of trial he was still ready, willing, and able to purchase the properties on the agreed upon terms (with a different closing date due to the passage of time). Anderson testified about what needed to be done to close on the properties, and Anderson stated, "[e]verything's done really. It's kind of been done for years now."

According to Anderson, at the time the contracts were signed and based on his interactions with Jose over the preceding months before they signed the contracts, Anderson had no concerns about Jose signing the contracts, Anderson had no awareness that there was any problem with the contracts or with Jose signing them, Anderson never got the sense that Jose did not understand the properties that he owned or that he was selling the five properties and that he was going to receive money and a note, and Anderson had no concerns whatsoever that Joe lacked

capacity. According to Anderson, he was asking the court and the jury to go forward with the contracts that he agreed to in 2013.

Testimony of Sam Boggan

At trial, excerpts of the deposition of Sam Boggan were read into the record. Boggan testified that he was a banker at Wells Fargo Bank from May of 2011 until July of 2020. According to Boggan, he and Anderson had been friends for close to ten years and Anderson owned many buildings downtown. Boggan had known Jose since 2008 and would speak to Jose at Wells Fargo where Jose conducted his banking business, and Boggan also spoke to Jose when he ate lunch at Jose's restaurant weekly, up until 2013 when Boggan began working at a different branch and stopped eating lunch at Jose's. Boggan would usually deal with Jose directly at the bank and would help him if he was needing assistance that the tellers could not provide, like if he needed a large amount of cash.

Boggan testified that he knew that Jose owned buildings downtown because Jose would speak about having to make repairs, and Boggan remembered that sometime in 2011 at Jose's restaurant Jose mentioned having to repeatedly make repairs to one of his buildings and he was frustrated. In late 2011, after Jose saw Boggan having lunch with Anderson at Jose's restaurant, Jose asked Boggan if he could ask Anderson to call Jose about buying some of Jose's buildings downtown and Jose said he was tired of paying the taxes and having to make repairs on the

11

buildings. Boggan testified he told Jose he would talk to Anderson, Boggan called Anderson and told him Jose wanted to speak to Anderson about buying some of Jose's buildings downtown, and Anderson seemed interested. Later, Jose called Boggan at the bank to inquire if Boggan had spoken to Anderson, and Jose "stayed on" Boggan for about a month until Anderson finally contacted Jose.

Boggan explained that Jose generally seemed to know what he was talking about and did not seem in any way mentally disoriented. Boggan last saw Jose in 2012.

Testimony of Gary McKinzie

Gary McKinzie testified he owned an air conditioning business, he met Jose when he fixed Jose's restaurant's air conditioning, and from there a long friendship began. McKinzie testified he ate at Jose's restaurant almost every day for lunch for ten or twelve years. According to McKinzie, he did not initially know that Jose owned other buildings besides the restaurant, but over time Jose began asking McKinzie to make air conditioning or electrical or other repairs to all of Jose's buildings downtown.

McKinzie went to the tax office with Jose, a tax office employee gave Jose a list of the total taxes he owed on his properties, and Jose complained about paying the taxes for so long and mentioned wanting to sell his properties. According to McKinzie, one day Jose mentioned that he had talked to his banker about seeing if

he knew anyone that would be interested in buying the properties, and then a couple of days later Jose called McKinzie and asked him if he could meet a potential buyer at one of the properties and then take him to look at the other properties because McKinzie knew all about the properties. McKinzie met Jose and Anderson at the first location along with one of McKinzie's employees, and then they went to see the other properties. McKinzie testified that the properties looked outdated and needed repairs, and he explained the condition of the properties as he showed them to Anderson so that Anderson could make a fair and accurate assessment of the properties.

McKinzie testified that when Anderson made an initial offer, McKinzie told Jose he felt like Jose could get a higher price and Jose "followed [McKinzie's] lead in making the counter[,]" and they felt like that price was the market price considering the properties' overall value, repairs that were needed, and any leases in place. McKinzie testified that when Anderson brought him the contracts, McKinzie and Jose went over them in the restaurant dining area, Jose signed all the documents, and they spent approximately four hours talking about the contracts. McKinzie testified that they reviewed one of the contracts "line by line[]" and then compared the other four contracts to that one to see any differences.

McKinzie explained that Jose "sought the buyer[,]" and McKinzie believed Jose understood that he was selling the five properties listed in the contracts, Jose

13

understood the prices he was getting per property, and how the owner financing was set up on the one property. According to McKinzie, while they were meeting, none of the employees or people around interrupted nor did they question Jose's ability to do business. At the time Jose signed the contracts, McKinzie had no concerns about Jose not being "lucid." McKinzie stated that "[a]t the time the contracts were signed, there [was] no doubt in my mind that Jose knew what he was doing[.]" According to McKinzie, "on that day that those [contracts] were signed, there was nothing wrong with Jose." If something had been wrong with Jose, McKinzie would have been the first person to step in, and before Jose signed the contracts McKinzie never saw anything whatsoever that gave him concern about Jose's mental condition or his cognitive abilities.

McKinzie said he had done business with Jose for sixteen years and Jose was his friend, he did not charge Jose anything for helping him with the contracts, and Jose did not pay him any kind of brokerage fee. According to McKinzie, once the guardianship was in place, he would visit Jose at his mother's house, but at some point multiple family members made a point to be there when McKinzie came over, McKinzie worried about "what it would put on Jose" and he told Jose that he thought it was best that he not come by anymore. McKinzie testified that Jose said that he understood, and that was the last time McKinzie saw or talked to Jose. According to McKinzie, other than paying for his business services, over the years Jose had

14

occasionally tried to give McKinzie things, like some heirlooms from a storage unit that Jose had paid McKinzie's brother-in-law to clean out and some gold pieces in a safe he had asked McKinzie to help him get open, but that McKinzie had declined the gifts. McKinzie testified that at one time Jose owed him approximately $63,000 for work, and that often when Jose would come back from Mexico, he would pay large portions to McKinzie towards the amount he owed. McKinzie agreed that over the years it was possible that his company billed Jose for over $200,000 worth of air conditioning and heating and electrical work, and that McKinzie had other individual customers that gave him as much business as Jose. McKinzie testified that he took Jose to Dr. Barrow to address his diabetes because his blood sugar was "400[,]" and McKinzie was diabetic and knew that level of blood sugar was a concern. McKinzie said he would not be surprised if there were medical records stating that Jose suffered from memory loss, dementia, and possible Alzheimer's. According to McKinzie, at the time of Jose's death, Jose owed McKinzie $10,000, and although McKinzie filed a claim against the estate for that debt, he ultimately non-suited the claim.

Testimony of Edmundo Javier Posadas Montemayor

Edmundo Javier Posadas Montemayor (Javier) testified that he was Jose's oldest nephew and that his mother was representing Jose's estate in this case. According to Javier, he, his sister Karla, and his sister's former husband, Sergio, were the three co-applicants in the guardianship proceeding that started in April of

15

2013. Javier testified he was an accountant and lived in Houston where he works in oil and gas, and he has worked for several companies for the past twenty-five years. Javier testified that growing up he would spend time in College Station and work at Jose's restaurant and that he was close with Jose. Although Javier moved to Houston, Karla and Sergio continued to live in College Station and would see Jose on the weekends and every other day.

Javier testified that Chalon Jones had been Jose's attorney for twenty or thirty years for business transactions and for estate planning. According to Javier, in 2006 Jones did some estate planning for Jose that included a statutory durable power of attorney naming Karla and Sergio as the family members in town to serve as Jose's agents in the event that Jose could not make decisions for himself in the future. Javier testified that when the durable power of attorney was executed there were no concerns about Jose's capacity. Javier testified that prior to 2011, Jose successfully ran his restaurant, owned multiple properties, traveled back and forth to Mexico, and participated in community affairs, but in 2011 Jose's family started to notice a decline with Jose.

Javier testified in May of 2011 or 2012 when he visited the restaurant, employees informed him, "you need to watch over your uncle because things are happening[,]" but they never gave any details. In 2011 or 2012, Javier went to his grandmother's house where Jose stayed, and it was "ransacked" like it had been

16

broken into, but Jose did not have an explanation for it. Javier testified that Jose and Javier's grandmother would often go to Mexico and two of Jose's restaurant employees had access to the house to check on the property. Javier contacted Adult Protective Services after the house had been "trashed" and because Jose had been aggressive with family, and they were concerned about him being taken care of when the family was away.

Javier testified that Jose was 70 or 71 years old when he began mentally declining, and Jose seemed preoccupied, he lost credit cards, employees were reporting that he was forgetting things, he was repetitive in his storytelling, and he was getting notices from the State Comptroller's Office relating to invoices from McKinzie for which sales tax had not been charged. Raquel, the manager at Jose's restaurant for twenty years, would help Jose with health matters and would communicate with the family about Jose's health. Javier noticed charges appearing on Jose's credit card statements for cards he had lost, that two restaurant employees had access to the cards, and when Jose was told about the charges, he did not seem alarmed but said that he must have misplaced the cards. Javier testified that in 2012, he was having dinner with Jose at Jose's restaurant and Jose would not eat until Javier told him to eat. Javier asked Jose if he could do an inventory on the restaurant to see what was going on with the finances, and Jose agreed. When Javier began looking into the restaurant's finances, his and Raquel's suspicion that the two

restaurant employees were taking advantage of Jose increased. Javier said he was unable to complete the inventory because one of those two employees Javier was suspicious of called Jose in Mexico, and then Jose called Javier and accused him of stopping business at the restaurant and stealing from him. In 2012, Jose executed a revocation of the prior power attorney, and around the same time, Jose ended his business relationship with Jones, who had been Jose's personal attorney for over thirty years. According to Javier, Jose was also not collecting all the rent owed him, tenants were complaining he was not making repairs, maintenance on the restaurant was not being performed, there were cash flow problems and failure to pay vendors, and the two restaurant employees Javier was suspicious of were running more and more of the business.

Javier believed that by around 2012 Jose's mental health had declined. Javier testified that his belief was supported by the May 2012 letter of Dr. Thomas Ginn, their family doctor, that was obtained by Jones in an effort to resolve the issue with the State Comptroller's Office, and the letter stated that Jose was suffering from dementia and that Jose had been to see a neurologist. Javier believed Jose had seen two neurologists and that by May 2012 both neurologists found Jose suffered from dementia and possibly Alzheimer's. According to Javier, in 2012, every time Javier offered to help Jose, he would refuse help and then turn to McKinzie and the two restaurant employees Javier was suspicious of. Jose gave one of the two employees

18

a truck in exchange for mowing Jose's grass, gave the other employee's child a collection of gold coins, and his expensive furniture ended up at the two employees' homes.

Javier testified that in March of 2013, the same day the contracts were signed, Jose was hospitalized with high diabetes, he was not taking his medications properly, and was not addressing his dehydration. Jose stayed overnight and was released the next day from the hospital. Javier testified that in April 2013, he received a call from Raquel that Jose was at the restaurant with McKinzie and the two restaurant employees, and McKinzie was having Jose sign documents. According to Javier, Raquel also called Jones and Jones told her the family had "screwed up" because in 2012 they did not get a guardianship, and they should have listened to Jones's advice and should have filed for guardianship in 2012. Javier testified that after Raquel's call in April 2013 about Jose signing documents (which Javier agreed that based on timing could not have been the contracts on the five properties), Javier "panicked" and he and Karla and his former brother-in-law decided to act.

Javier, Karla, and Sergio filed a temporary guardianship application, a temporary restraining order to keep the two employees and McKinzie away from Jose's finances, and a lis pendens on Jose's property. The guardianship application was file-stamped April 17, 2013. In April 2013, a temporary restraining order was signed as to the two restaurant employees and McKinzie, and Javier testified that

they waited until 2013 to seek help from the court because the family was reluctant to act because they did not want to cause Jose's mental health to further decline. According to Javier, over the next year after he qualified as temporary guardian, Jose's mental health further declined, and the cost for Jose's monthly care was over $3000 a month for caregivers.

Javier agreed that he was aware that Dr. Ginn's records showed that Jose's Mini-Mental score from 2011 was a 25 out of 30 which indicated normal cognition, that in August 2012 Jose signed a revocation of power of attorney before a notary public, that in November 2012 Dr. Ginn noted that Jose was conversant and oriented during an exam, that in January 2013 Dr. Ginn's office allowed Jose to sign a HIPAA release about his patient's rights, and that in April 2013 Scott and White Hospital allowed Jose to sign a similar release and consent to treatment.

Javier agreed that Jose was not selling all his properties (such as the restaurant and the house where Javier's grandmother lived), and that two of the properties Jose was selling were vacant and had no cash flow but had expenses such as repairs and property taxes. Javier admitted that in December of 2018, the Court removed Javier, Karla, and Sergio as guardians because they failed to comply with the Texas Estates Code by timely filing annual reports and annual accounts, failing to post a $500,000 bond, and failing to sell a property as ordered by the court. Javier agreed that when the three family members were removed, the court replaced them with an attorney.

20

Javier agreed that he understood that those inheriting from a person's estate could benefit if the properties owned by that person are not sold until that person dies because the capital gains tax created by a step-up basis are avoided. Javier testified that he and those that had filed for the guardianship, along with other family members who attended trial, would inherit from Jose's estate. According to Javier, however, in filing the guardianship plan and acting as guardian, he was not trying to save the properties for himself and the other two family members who had filed the application for guardianship. According to Javier, the estate was complicated, the guardians of the estate were trying to keep it together the best that they could in their roles as guardians, the attorney's fees were expensive, and he gathered information and presented it to the attorneys the entire time he served as co-guardian.

Testimony of Chalon Jones

Chalon Jones testified that he had known Jose since the early 1970's, that Jose was a good friend and good client, and that Jones knew Jose well. In 2006, Jones got Jose to do a new power of attorney because he could see Jose had many rent properties and that Jose would need help with them at some point as he got older. Jones testified that as Jose's lawyer and friend he felt it was his responsibility to look out for Jose. For instance, on one occasion Jose started to buy property to put another restaurant on, but Jones knew the property was restricted for residential purposes

21

only, so Jones explained to Jose that he could not build a restaurant on that property, and Jones called the sellers and cancelled that purchase.

Jones testified that in the middle of 2011, Jose let his insurance lapse on his rental property, Jones (who serviced the loan for another client who had loaned Jose money) was notified by the insurance company, Jose did not have any explanation for letting it lapse, and he almost let it lapse again later. According to Jones, Jose would also regularly come in and pay the mortgage payments on that loan to Jones, but in 2011 he started just paying with random and sometimes insufficient amounts of cash from his pocket and refused Jones's suggestion for Jose to set up a bank draft to make the payments. Jones testified that this made him concerned that Jose could be mentally declining. In late 2011 and early 2012, Raquel from Jose's restaurant would alert Jones about problems she was observing with Jose, like his driving. In May of 2012, Jones heard Raquel's concern about Jose's driving, and Jones waited in his car outside one of Jose's properties and, once Jose came out and got in his own car, Jones followed him. According to Jones, Jose ran two stop signs, ran red traffic lights, almost had a collision, and repeatedly used his "blinker" but did not turn. Jones talked with Jose's family about it and they tried to take Jose's keys from him, but Jose would get more keys made so they finally took his license plates off his car. Eventually, Jose allowed someone else to drive him everywhere.

Jones also found out that Jose purchased a home in a nice subdivision and Jones investigated because it was a "giant" and expensive house for a single person and a "long way out there[.]" Jones testified that when he looked into how Jose had financed the purchase of the home by checking through the title company that had handled the closing, Jones learned Jose had obtained the financing through a local bank. According to Jones, he "wasn't involved in the transaction and probably on purpose. It was a realtor involved who wouldn't want me around, and also Jose probably didn't either." Jones also testified that on another occasion he learned that Jose had taken out a $30,500 loan with a lien against his restaurant and when Jones inquired about it to Jose, Jose responded, "I would never mortgage the restaurant." Jones testified that despite the fact that Jose had been coming to Jones's office at least monthly since 2007, Jose began missing appointments with Jones because Jose could not find Jones's office. Jones also learned that one of Jose's tenants was in serious arrears, and Jones had prepared the lease for that matter. When Jones confronted Jose about it, Jose explained that the tenants were "having a hard time[,]" but Jones felt like the tenant's business was doing well and the tenant was taking advantage of Jose.

Jones testified that he had concerns about Jose's cognitive ability because it seemed people close to him were taking advantage of him. Jones testified that he believed that one of Jose's employees that was close to Jose was "getting money

from Jose and he shouldn't have been[,]" that a young man that was a "garden hand[]" who mowed Jose's yard and drove Jose around had a new $40,000 truck, and that Jose was paying "way too much for his air conditioning bills." Jones testified he also thought Jose was having cognitive difficulties because sometimes Jones had to explain things three times to Jose.

During the 2011 to 2012 timeframe Jones dealt with the State Comptroller's Office regarding Jose failing to file sales tax reports, he explained to the Comptroller that Jose was "losing it mentally[,]" and Jones went to Dr. Ginn for Ginn to observe Jose and write a letter indicating that Jose was having some mental problems. According to Jones, when he suggested to Jose that he needed help, Jose responded that he did not need help and that he was "just a little old and forgetful[,]" and that he was "doing all right." Jones testified that Jose would talk about how his sister was "too pushy" and that he did not want his sister's husband, Sergio, taking care of his business. Jones volunteered to take over the management of Jose's real estate, but Jose did not want Jones to manage the properties. Jones worked with Jose's family members to try and get them to file a guardianship. Jose fired Jones as his attorney on August 22, 2012, which surprised Jones. Later Jones learned that Kevin Bell from Houston would be Jose's new lawyer, Bell asked for Jose's files, and McKinzie picked the files up from Jones.

Regarding the five commercial real estate contracts, Jones testified that Jose never talked to Jones about the contracts. Jones expressed the opinion that someone suffering from dementia would be unable to understand the nature and consequences of those contracts, that at the time Jose signed the contracts Jose did not understand that he was selling the five properties for the prices indicated on the contracts and that one would be owner financed and one purchased through financing through a third party, and Jones believed that Jose did not have sufficient mental capacity and memory to understand all the alternatives to selling the property. Jones also believed that in 2013 Jose was not capable of analyzing and understanding capital gains issues with sales of property and he would not have understood that if the purchaser defaulted on the note for the property that was owner financed that it could end up in litigation even if Jones had explained it to him. Jones did believe that Jose could have possibly understood that he was not getting all of the purchase price up front, and that money would be paid later.

Jones testified that he learned about the contracts on August 16, 2013, that he called Anderson and told Anderson he did not think the contracts were going to close, but he did not tell him he was Jose's former attorney. According to Jones, later that same day Raquel called and told Jones that McKinzie, Anderson, and Jose were about to close the deal that day at Jose's restaurant, but Jones acknowledged at trial that the contracts involved a title company that would handle closing and that when

Jones went to the restaurant that day, Anderson was not there. Jones testified he believed Anderson was somehow in a conspiracy with either the employees of the restaurant or McKinzie.

Jones filed a claim against Jose's estate for approximately $45,000 for legal services rendered July 2011 and past the date that Jose fired him. According to Jones, he helped Jose's family file the guardianship action after he had been fired by Jose, but he did not have Jose sign a waiver of attorney-client privilege that would allow Jones to disclose information to Jose's family members. When asked if he remembered, as part of the claim he filed against Jose's estate, making a statement that "we need to sue Gary McKinzie to get that mud on Zane Anderson's skirt because McKinzie is the one who got Anderson on Jose's trail?" Jones answered, "Sounds like something I might have said." Jones admitted not knowing who initiated contact with respect to the sale of the properties, and he did not know whether McKinzie and Anderson had ever met prior to this deal.

Testimony of Gregory Burr

Gregory Burr testified that he was a co-owner of a building next door to one of Jose's old restaurants, and Burr was a busboy at that restaurant when he was thirteen. Burr testified that when he got into the family business around 1990, he would see Jose on a regular basis, and Jose was a friend and "like family" to Burr. According to Burr, in the couple of years prior to 2013, Burr "could see that [Jose]

26

had dementia/Alzheimer's[]" and "shaking in the hands and [] Parkinson's disease." Burr explained that he had watched his mother's decline with Alzheimer's, and he observed a similar decline in Jose. Burr testified that several times when Jose would collect the rent from the tenant in the building next door, Jose would get confused and come into Burr's building because Jose was unable find his vehicle.

Burr testified that in March of 2013, he was alarmed when he saw Jose at Jose's restaurant greeting tables like he always did, but this time "[h]e went to a couple of tables more than once, more than twice, three times[]" and then went to a wall and started scratching it. Burr told some of the employees and asked them to bring Jose to his table so that Burr could talk to him. After they spoke, Burr told one of the employees that Jose did not need to be staying by himself. Burr admitted that he was aware that Jose was diabetic, that a person can get lightheaded and dizzy from being diabetic, and that Jose was not good about taking his medication, but Burr was not aware if Jose ended up seeing a doctor or whether he had "sky high blood sugar." Based on what people told him, Burr believed this incident in the restaurant happened before the five contracts were signed, and Burr testified that he thought that Jose "was ill[]" at the point in time the contracts were signed.

Testimony of Raquel Mata Martinez

Raquel Mata Martinez testified that she had worked for Jose since 1999 at his restaurants (his old restaurant and the more recent one) and later her other family

27

members also worked at Jose's restaurant. Martinez worked her way up and eventually handled payroll for Jose's restaurants. Martinez described Jose as "an outstanding person[]" who was "very friendly."

According to Martinez, in mid-2011, there was a change in Jose's behavior and he would wear the same shirt, which was out of character for him as he was always dressed "very sharp, very clean." On one occasion he had his shoes on the wrong feet, many occasions he would have his shirt or pants not completely fastened, he more than once was incontinent at work, he drove erratically, and more than once she found personal items such as his credit card, Social Security card, and Medicaid card in the restaurant office trash can. Martinez testified that he was forgetting to pay a lot of bills and forgetting the time of day, and "the pile of bills kept getting bigger and bigger by the week[.]" According to Martinez, Jose was also taking $300 cash daily out of the cash register (that was not part of his salary) and buying "bigger items" and "nonsense stuff[,]" although she admitted she did not know whether or not he had always done that because she did not start working the cash register until 2011. Martinez testified that the day after her wedding in September of 2011, Jose told customers at the restaurant that he fell dancing at the wedding and that he saw underneath Martinez's dress, which she said never happened.

Martinez testified she knew Chalon Jones was Jose's attorney and she and Jones would keep in contact about changes they were noticing with Jose. Martinez

also told Jose's sister, Esthela, as well as Karla, and Sergio that they needed to check on Jose. According to Martinez, McKinzie helped Jose get a new attorney in 2012 and McKinzie brought her an invoice for her to pay for legal work the attorney had done for Jose. Martinez testified that she told McKinzie then that Jose's condition was declining, and that McKinzie smiled in response. Martinez testified that she felt like McKinzie was overcharging him and she questioned McKinzie's invoices to Jose. In Martinez's opinion, in late February or early March of 2013, Jose would not have understood the five contracts. Martinez testified that on the day she called Jones to tell him people were at the restaurant closing a real estate transaction, she saw McKinzie there, but she never saw Anderson that day.

Testimony of Dr. Mark Kunik

A video recording of Dr. Mark Kunik's deposition was played at trial. Dr. Kunik testified that he is a geriatric psychiatrist, he evaluated Jose on May 4, 2013, and he then completed a report based on his evaluation. Dr. Kunik testified he spent over an hour with Jose. Dr. Kunik administered a Montreal Cognitive Assessment, which assesses a person's cognition and is widely used in geriatric psychology, and which Kunik has used thousands of times.

According to Dr. Kunik, on the assessment Jose was unable to draw a clock face, identify certain animals, remember certain objects, words, numbers, letters, and sentences during the assessment, unable to make associations between objects,

unable to provide the correct day of the month or month, and he told Kunik he believed it was 1980. Dr. Kunik testified that if Jose was having severe hypoglycemia during the assessment Kunik would have been able to pick up on that, and if someone had high blood glucose sugars for a long time it might not change their thinking but if they "had pretty well-controlled sugars and they've bumped up to 400," then it could impact their cognitive functioning. Dr. Kunik completed a Physician's Certificate of Medical Examination form based on his assessment of Jose, and it was admitted into evidence. On the form for "Evaluation of the Proposed Ward's Mental Function" he noted "Mental Diagnosis: Probably Alzheimer's dementia[]" and listed the severity as moderate. On the form, Dr. Kunik indicated his opinion, based on his assessment, that Jose did not have sufficient capacity to give informed consent to the administration of dementia medications, Jose was unable to make or communicate reasonable decisions concerning contract and incurring obligations, and that Jose was totally incapacitated. Dr. Kunik also testified that he wrote a letter as requested from the attorney handling the guardianship regarding his opinion on how far back Jose's incapacity would have gone based on reasonable medical probability, and Dr. Kunik wrote in the letter his opinion that Jose's incapacity would have gone back six months prior to his evaluation on May 4, 2013. In Dr. Kunik's opinion and based on his review of Jose's medical records, Jose lacked sufficient mind or memory in the February 2013 to March 2013 time

frame to understand the nature and consequences of signing five contracts to sell commercial real estate in downtown Bryan or to understand real estate contracts.

On cross-examination, Dr. Kunik agreed that there are different types and levels of mental capacity for legal purposes, like testamentary capacity, donative capacity, and contractual capacity. Dr. Kunik acknowledged that if a real estate transaction was entered into and the seller initiated the sale, the seller wanted to sell five of their properties but not sell others, the seller was able to take the buyer on a tour of the properties and describe their condition, the seller pulled tax appraisal value records and set a sales price higher than those values for the five values, the seller had a desire to sell based on continuing property tax expenses and an intent to sell the properties for liquidity, there was a consistent tenor to the transaction over time, those facts would suggest a normal and reasonable real estate deal and would not raise "a red flag" regarding the seller's capacity. Dr. Kunik agreed that the court-ordered evaluation did not ask him to specifically weigh in on the contracts between Jose and Anderson. Dr. Kunik testified that testamentary capacity and contractual capacity have different thresholds and that there are varying degrees of dementia. Dr. Kunik agreed that the medical records he reviewed were from Dr. Ginn dated May 17, 2012, and Scott and White dated April 23, 2013 and April 29, 2013, that he did not remember who gave him the records, and that he did not review Jose's medical records from earlier in 2013 or in 2012 or 2011 or any mini-mental exams

31

performed on Jose in the two or three years prior to Kunik's evaluation. Dr. Kunik acknowledged that a score of a 25 out of 30 on the Mini-Mental State Examination would indicate a normal cognitive level. Dr. Kunik testified that his intention for filling out the Physician's Certificate of Medical Examination was that it would be used for assisting the court in determining whether Jose needed a guardian, not whether the five contracts Jose entered into should be nullified.

Testimony of Charles Randall "Randy" Michel

A video recording of Charles Randall "Randy" Michel's deposition was played at trial. Michel testified that he knew Jose because Michel frequented Jose's two restaurants, and in 2013, he served as the attorney ad litem for Jose in the guardianship case. According to Michel, he was asked to serve as Jose's attorney ad litem on either April 18 or 19, 2013. Michel testified that after he was appointed, he visited with Jose several times and that his role was to advocate for what Jose wanted. Michel testified that it was very clear that Jose did not want a guardianship. According to Michel, other relatives besides Javier, Karla, and Sergio were seeking guardianship. Michel testified that at the time the court signed the order appointing the temporary guardians on May 21, 2013, Dr. Kunik's report had been provided to the court. Michel testified that he filed the motion to have Kunik examine Jose and that he helped arrange a time to meet with and evaluate Jose at Jose's home, and that Michel believed Jose understood that he was being evaluated.

Michel testified that the effect of the TRO against McKinzie and the two employees was to prohibit them from selling, transferring, assigning, or disbursing any of Jose's assets, and that the judge signed an order on April 29, 2019, extending the TRO and setting a hearing for May 7, 2013. Michel testified that in the court order appointing Javier, Karla, and Sergio as permanent co-guardians of Jose and his estate signed on August 27, 2013, the trial court found that Jose was totally incapacitated and totally incapable of maintaining his person and handling his finances, and the order stated that the determination was based on evidence of recurring acts or occurrences within the preceding six-month period and not isolated instances of negligence or bad judgment.

According to Michel, based on his dealings with Jose from April 18, 2013, and for a few months after and until his role as Jose's attorney ad litem ended, he did not believe that as of April 2013 that Jose had sufficient mind and memory to understand real estate contracts.

Michel acknowledged that generally the legal obligations of Jose's pre-guardianship would become the legal obligations of the post-guardianship, and assuming the validity of any contracts from pre-guardianship, the guardians "step into the shoes" of the ward and would be obligated under those contracts. Michel also agreed that Texas law presumes someone has capacity and that there are no presumptions that somebody is incapacitated just because of their age or because

they have been diagnosed with dementia. Michel testified that testamentary capacity and contractual capacity have different standards, and to have contractual capacity, a person would have to understand the nature and effect of the contract and the business being conducted. Michel testified that he heard "over and over" about the capital gains tax consequences of the five contracts from Jones and Javier, and Michel testified that if a person sells property prior to their death, they may have capital gains but if instead a future beneficiary inherits the property and it is sold instead after death then the capital gains tax is "wiped out." When asked if he would agree that there might be some competing interests among beneficiaries of Jose's estate about why they might want him to not sell property because it would not be in their own best interest from a tax perspective, Michel answered, "Oh, I am sure there are competing interests."

Michel agreed that dementia is a medical condition that is progressive in nature and that it generally manifests itself in early stages with forgetfulness. When showed an exhibit that was part of a neurological report done by Texas A&M on November 28, 2011, Michel testified that the report showed that Jose had scored a 25 out of 30 on a mini-mental status exam. Michel testified that he was not aware that Jose had another medical visit where he was described by the doctor as being conversant, calm, and oriented and was not aware that in June of 2013 Jose was at a doctor's visit where the doctor noted Jose may have mild dementia, and the doctor

34

prescribed a low dose of Aricept. Michel agreed that Jose did not do well on the cognitive assessment administered by Dr. Kunik, but admitted that he was not aware that those types of assessments had been criticized, that the contacts regarding the five contracts went back to August of 2012, that Jose initiated the contact with Anderson for Jose to sell the properties, that at Jose's urging he met with Anderson to take him through the properties in October 2012, and that negotiations took place between Jose and Anderson from October 2012 until April 2013 when the contracts were signed. Michel acknowledged that the court's rulings about Jose's mental capacity were not made on the day the contracts were signed, that Michel was not with Jose when he signed the contracts and to Michel's knowledge neither was Dr. Kunik, and there was nothing about the five contracts that on their face raised questions about Jose's capacity.

Other Evidence

The contracts for the five properties, the surveys of the properties for which Anderson was seeking financing, the title commitments from the title company for each of the five properties, and the appraisal reports ordered by the bank on Anderson's behalf to close on the four properties were all admitted into evidence. Among other evidence, the jury had before it legal documents related to Jose's revocation of his power of attorney, the TRO, and the guardianship proceeding.

35

Applicable Law and Standard of Review

A party seeking specific performance must plead and prove (1) compliance with the contract including the tender of performance unless excused by the defendant's breach or repudiation and (2) the readiness, willingness, and ability to perform at relevant times. *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593-94, 601 (Tex. 2008); *see also Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). If the plaintiff's ability to perform depended on third-party financing, the plaintiff must show that he had "a firm commitment for financing[.]" *Luccia v. Ross*, 274 S.W.3d 140, 146-47 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

Mental incapacity is a common law defense to the formation of a contract. *In re Morgan Stanley & Co.*, 293 S.W.3d 182, 187 (Tex. 2009) (orig. proceeding); *see also Kinsel v. Lindsey*, 526 S.W.3d 411, 419 (Tex. 2017) (documents executed by one who lacks sufficient legal or mental capacity may be avoided). Texas law presumes that a person executing a contract or instrument had sufficient mental capacity at the time of its execution to understand his legal rights. *Bradshaw v. Naumann*, 528 S.W.2d 869, 873 (Tex. App.—Austin 1975, writ dism'd); *see also Hall v. Hall*, 352 S.W.2d 765, 767 (Tex. App.—Houston 1962, no writ) (mental capacity to contract must be determined as of contract execution date). Accordingly, the burden rests on the person seeking to set aside a contract or instrument to show

36

the lack of mental capacity of the contracting party at the time the contract or instrument was made. *Bradshaw*, 528 S.W.2d at 873. To establish lack of mental capacity to contract in Texas, the evidence must show that, at the time of contracting, the person could not have "'appreciated the effect of what [he] was doing and understood the nature and consequences of [his] acts and the business [he] was transacting.'" *See Kinsel*, 526 S.W.3d at 419 (quoting *Mandell & Wright v. Thomas*, 441 S.W.2d 841, 845 (Tex. 1969)). The proper inquiry is whether the person had capacity on the days he executed the documents at issue. *Id.* Generally, the question of whether a person, at the time of contracting, knows or understands the nature and consequences of his actions is a question of fact. *See Fox v. Lewis*, 344 S.W.2d 731, 739 (Tex. App.—Austin 1961, writ ref'd n.r.e.).

In a legal sufficiency challenge, we credit evidence that favors the finding, if a reasonable factfinder could, and we disregard evidence contrary to the challenged finding unless a reasonable factfinder could not disregard it. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). When a party challenges the legal sufficiency of the evidence on an issue for which it did not have the burden of proof, the appellant must show there is no evidence to support the adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). In reviewing a no-evidence challenge, we view the evidence in the light most favorable to the verdict. *Weirich v. Weirich*,

833 S.W.2d 942, 945 (Tex. 1992). We cannot sustain a legal insufficiency, or no-evidence point, unless the record shows:

> (1) . . . a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.

*Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998); *see also Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016). As the sole judges of the credibility of the witnesses and the weight to be given their testimony, the jurors may choose to believe one witness and disbelieve another. *City of Keller*, 168 S.W.3d at 819. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

In contrast, when the party that had the burden of proof at trial complains on appeal of the legal insufficiency of the adverse finding, that party must demonstrate that the evidence establishes conclusively, i.e., as a matter of law, all vital facts in support of the finding sought. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). A matter is conclusively established only if reasonable people could not differ as to the conclusions to be drawn from the evidence. *See City of Keller*, 168 S.W.3d at 816.

When challenging the factual sufficiency of the evidence supporting an adverse finding on which the appellant did not have the burden of proof at trial, the appellant must demonstrate that there is no or insufficient evidence to support the adverse finding. *Croucher*, 660 S.W.2d at 58; *Am. Interstate Ins. Co. v. Hinson*, 172 S.W.3d 108, 120 (Tex. App.—Beaumont 2005, pet. denied). When reviewing the factual sufficiency challenge, we consider and weigh all the evidence in support of and contrary to the jury's finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998). We only set aside a finding for factual insufficiency if it "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex. 1985). However, when a party attacks the factual sufficiency of an adverse finding on which it carried the burden of proof at trial, that party must demonstrate on appeal that the "adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co.*, 46 S.W.3d at 242.

Jury's Finding as to Question No. 2

In issue one, Appellant argues there was no evidence or, alternatively, factually insufficient evidence to support the jury's answer to Question No. 2. Question No. 2 asked whether Appellee was ready, willing, and able to perform the contracts, and the jury answered "yes." Specifically, Appellant argues that there was

no evidence that Anderson had either the cash required or the loan commitments necessary to purchase the properties.

The jury heard Zane Anderson testify that he had done everything required of him to be in a position to close on the contracts, and that based on the commitments, the appraisals, the surveys, arranging things with the bank, he was fully committed and fully prepared to close on the properties on May 31, 2013. The jury heard Anderson testify that he sent a letter to Jose's counsel stating he was ready, willing, and able to still perform on the contracts and was willing to close on May 31, 2013, under the agreed upon terms. Anderson testified that he was still ready, willing, and able to purchase the properties on the agreed upon terms (with a different closing date due to the passage of time). Anderson testified he was still willing to purchase the properties and that, that as to what needed to be done to close on the properties, Anderson stated, "[e]verything's done really. It's kind of been done for years now." No evidence was presented by Appellant otherwise, and Appellant presented no contrary evidence that Anderson did not have either the cash required or the loan commitments necessary to purchase the properties.

The issue of whether a party to a contract is "ready, willing, and able" to perform is a question of fact. *DiGiuseppe*, 269 S.W.3d at 596. Here, the jury, found that Anderson was "ready, willing, and able" to perform the contracts. As the factfinder, the jury was entitled to rely on Anderson's testimony. *See Peters v.*

40

*Young*, No. 11-18-00008-CV, 2019 Tex. App. LEXIS 11243, at \*16 (Tex. App.—Eastland Dec. 31, 2019, pet. denied) (mem. op.) (factfinder could rely upon seller's testimony that they were ready, willing, and able to perform under the contract) (citing *Mustang Amusements, Inc. v. Sinclair*, No. 10-07-00362-CV, 2009 Tex. App. LEXIS 8338, at \*\*12-14 (Tex. App.—Waco Oct. 28, 2009, no pet.) (mem. op.) (same)). To the extent Appellant argues that there was no evidence that Anderson had "a firm commitment for financing," we note that Anderson testified that he had done all that was necessary to close on the properties, and that following the execution of the contracts, he took all of the steps he needed to do in order to close on the properties, he delivered the contracts to his bank to begin the loan process, he agreed to an interest rate on loans with his bank on the four contracts that required third-party financing, he obtained title commitments, he obtained and paid for surveys, he obtained and paid for the appraisals requested by his bank, and he had financing in place to close the transactions. Anderson also testified he was committed to paying off the owner-financed note for the purchase of the fifth property.

As the sole judge of the credibility of the witnesses and the weight to be given to their testimony, it was the jury's province to determine what the underlying facts were at the time the real estate contracts were executed and also whether Anderson was ready, willing, and able to perform. The jury reasonably could have credited

41

Anderson's evidence over conflicting evidence, if any, presented by Appellant. Viewing the evidence and inferences in the light most favorable to the jury's finding, we conclude there is more than a scintilla of evidence supporting the jury's finding that Anderson was ready, willing, and able to perform under the contracts. *See City of Keller*, 168 S.W.3d at 827. Given the record before us, we cannot say that the evidence conclusively established that Anderson was not ready, willing, and able to perform. *See Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 229 (Tex. 1986) (stating an element is not conclusively established when evidence is conflicting). We conclude a reasonable factfinder could have found that Anderson was ready, willing, and able to perform the contracts to buy the five properties at issue in the case. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009); *Merrell Dow. Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997); *see also DiGiuseppe*, 269 S.W.3d at 593-94, 601. Considering all the evidence, the jury's finding was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Dyson*, 692 S.W.2d at 457. We overrule issue one.

## Jury's Finding as to Question No. 3

In issue two, Appellant challenges the legal and factual sufficiency of the evidence supporting the jury's answer to Question No. 3 regarding whether Jose's failure to comply was excused due to his mental capacity. The jury answered "no"

42

to this question. According to Appellant, testimony from Jose's nephew (Javier), Jose's attorney (Jones), Jose's long-time employee (Martinez), Jose's friend (Michel) and Dr. Kunik, as well as the medical records from Jose's treating doctors, established that Jose suffered from dementia and lacked sufficient mental capacity and memory to understand the nature and consequences when he signed the five earnest money contracts in March 2013. Appellant further contends that the evidence from Anderson and McKinzie regarding Jose's competence "would not allow reasonable and fair-minded jurors to determine that Jose was competent in March 2013."

As the person seeking to set aside the contracts based on Jose's alleged lack of mental capacity at the time the contracts were made, it was Appellant's burden to present evidence that, at the time of contracting, Jose could not have "appreciated the effect of what [he] was doing and understood the nature and consequences of [his] acts and the business [he] was transacting." *See Kinsel*, 526 S.W.3d at 419; *Mandell & Wright*, 441 S.W.2d at 845. The jurors were the sole judges of the credibility of the witnesses and the weight to be given their testimony, and the jurors could choose which witnesses, and which portions of their testimony, to believe or disbelieve. *See City of Keller*, 168 S.W.3d at 819.

The jury heard Anderson's testimony that he knew Jose because they lived down the street from each other when Anderson was a child, he would see Jose at

43

the business association events, and Anderson knew him from eating at Jose's restaurant. The jury heard Anderson testify that when he met with Jose that Jose seemed "like himself; friendly and happy[,]" that Anderson had no concerns about Jose's ability to understand their conversation or about moving forward with the real estate contracts with Jose, and that no one at the restaurant expressed concerns about Anderson visiting with Jose about real estate or a business deal. The jury could have considered Anderson's testimony that at the time the contracts were signed and based on his interactions with Jose over those preceding months, Jose seemed to understand what he was doing and Anderson had no concerns about Jose signing the contracts, Anderson explained he believed Jose understood the properties that he owned, that he was selling the five properties, and that he was going to receive money and a note, and Anderson had no concerns whatsoever that Jose lacked capacity. Also, the jury heard Anderson's testimony that as Jose showed him the properties, Jose seemed to know about the properties and understood and responded to the questions Anderson asked him. Anderson agreed that after he received the call from Jones that the sales may not close, Anderson visited Jose at the restaurant to discuss the contracts, the visit was similar to the other visits he had with Jose, no one approached and told Anderson he could not do business with Jose, it was apparent to Anderson that Jose wanted to move forward and understood who Anderson was

and why he was there, Jose seemed lucid, and it was Anderson's impression that he and Jose both still wanted to proceed with the sales as stated in the contracts.

The jury could have given weight to Boggan's testimony that Jose approached him about putting Jose in touch with Anderson, and that Jose told Boggan he wanted to sell several properties because Jose was tired of paying taxes on them and making repairs. Further, Boggan frequently interacted with Jose at his restaurant and at the bank, and that at the time Jose was wanting to sell the properties Jose generally seemed to know what he was talking about and did not seem in any way mentally disoriented.

The jury heard McKinzie's testimony that he ate at Jose's restaurant almost every day for lunch for ten or twelve years, was friends with Jose, and had done business with Jose for sixteen years. McKinzie testified that Jose complained about having to have paid the taxes for so long and mentioned wanting to sell his properties. The jury could have considered McKinzie's testimony that while they were meeting in April 2013 to go through the contracts at the restaurant, none of the employees or people around interrupted questioning Jose's ability to do business, and that at the time Jose signed the contracts, McKinzie felt Jose was lucid. The jury also heard McKinzie, who had been Jose's long-time friend, testify that "[a]t the time the contracts were signed, there [was] no doubt in my mind that Jose knew what he was doing[,]" and that "on that day that those [contracts] were signed, there was

45

nothing wrong with Jose." McKinzie also testified that if something had been wrong with Jose he would have stepped in, and that prior to Jose signing the contracts McKinzie never saw anything whatsoever that gave him concern about Jose's mental condition or his cognitive abilities.

The jury could have considered Javier's testimony that he and the two other family members did not seek the guardianship until April 2013, after Jose had already pursued Anderson to sell the properties and after Jose had executed the commercial real estate contracts, that the family members were removed from the guardianship for failing to file accountings with the court, that Javier was a beneficiary of the estate, that the estate beneficiaries could benefit from setting aside the sales and trying to sell the property later after Jose's death, and that Jose had cash flow problems and may have needed to sell the properties, and Javier never thought it was a good idea for Jose to sell his properties. The jury heard Javier testify that he was aware that Dr. Ginn's records showed that Jose's Mini-Mental score from 2011 was a 25 out of 30, which indicated normal cognition, that in August 2012 Jose signed a revocation of power of attorney before a notary public, in November 2012 Dr. Ginn noted that Jose was conversant and oriented during an exam, that in January 2013 Dr. Ginn's office allowed Jose to sign a HIPAA release about his patient's rights, and that in April 2013 Scott and White Hospital allowed Jose to sign a similar release and consent to treatment. The jury could have weighed the testimony of

46

Javier, Jones, Burr, Michel, and Dr. Kunik and given some or no weight to some, all, or none of the testimony. *See City of Keller*, 168 S.W.3d at 819. The jury could have weighed all the testimony and evidence and believed that the evidence did not establish that Jose lacked sufficient mental capacity and memory to understand the nature and consequences of his actions and the business he was transacting at the time he signed the contracts. *See id.* After considering evidence favorable to the adverse finding and disregarding all contrary evidence unless a reasonable factfinder could not, as we must, we conclude that Appellant failed to demonstrate that the evidence presented at trial established as a matter of law that Jose lacked sufficient mind and memory to understand the nature and consequences of his act and the business he was transacting. *See Dow Chem. Co.*, 46 S.W.3d at 241; *Sterner*, 767 S.W.2d at 690; *see also Kinsel*, 526 S.W.3d at 419 (quoting *Mandell & Wright*, 441 S.W.2d at 845). We conclude that Appellant has failed to demonstrate on appeal that the jury's finding was against the great weight and preponderance of the evidence. *See Dow Chem. Co.*, 46 S.W.3d at 242. We overrule issue two.

Award of Attorney's Fees

In issue three, Appellant argues the judgment and award of attorney's fees in the amount found by the jury in Question No. 4 should be reversed and the attorney's fees found by the jury in Question No. 5 should be awarded to Francisca. According to Appellant, because Jose was not competent when he signed the contracts and

47

because the evidence does not support the finding that Appellee was ready, willing, and able to perform the contracts, Appellant should recover the attorney's fees as the prevailing party. Because we have overruled issues one and two, we also overrule issue three. Having overruled Appellant's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on May 13, 2022
Opinion Delivered February 23, 2023

Before Golemon, C.J., Johnson and Wright, JJ.